IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02269-MEH

WTI PARTNERS,

    Plaintiff,

v.

GREGORY AHN,
CULT OF 8, INC.,
ALCOHOL BY VOLUME, INC.,
JONATHAN WHITE, and
MATTHEW SCARLETT,

    Defendants.

---

**ORDER ON MOTION TO DISMISS**

---

Before the Court is Defendants Jonathan White, Matthew Scarlett, and WJSM Enterprises, Inc.'s [d/b/a Alcohol by Volume, Inc. ("ABV")] Motion to Dismiss for Lack of Personal Jurisdiction [filed November 19, 2018; ECF No. 16]. The matter is fully briefed, and the Court finds oral argument would not materially assist the Court in its adjudication of the motion. For the reasons that follow, the Court grants the motion to dismiss Plaintiff's claims without prejudice.

## BACKGROUND

### I. Procedural History

Plaintiff, WTI Partners ("WTI"), initiated this action on August 31, 2018, then filed the operative Amended Complaint against Defendants Gregory Ahn ("Ahn"), Jonathan White ("White"), Matthew Scarlett ("Scarlett"), Cult of 8, Inc. ("CO8"), and Alcohol by Volume, Inc. ("ABV"), alleging claims for breach of contract, breach of fiduciary duty, unjust enrichment, fraud, and civil conspiracy, and seeking a declaration as to its interests in the entity Defendants and an

accounting as to the royalties and proceeds allegedly owed to WTI, which claims to have had a purported equity share in CO8 and/or ABV. Am. Compl., ECF No. 7.

Scarlett, White, and ABV (collectively, the "ABV Defendants") filed the present motion on November 19, 2018, arguing that WTI fails to demonstrate the Court's personal jurisdiction over them because they are not residents of nor have any financial or other contacts with Colorado. Further, the ABV Defendants assert that although Scarlett and White visited Colorado in 2015 to meet with certain WTI officials, these meetings did not relate to any loans or other financial matters concerning CO8 and/or ABV but, rather, involved discussions with WTI partner, Robert Niemeyer, regarding the creation of a new venture and/or Scarlett's and White's concerns about potential improper reporting by Ahn to WTI.

WTI counters that the ABV Defendants' contacts with Colorado are "actually substantial and directly connected to this dispute." Resp. 2. WTI contends that Scarlett and White made several multi-day visits to Colorado to meet with WTI and discuss business operations and financial records of the enterprise at issue here, primarily stayed overnight at Niemeyer's residence in Boulder, and corresponded with WTI via telephone and email while sending various company documents and financial reports to WTI in Colorado. WTI asserts that it was during, and as a result of, these visits/communications that it suffered the harms set forth in the operative pleading. It also argues that the ABV Defendants' activities were "inextricably intertwined" with those of Ahn and CO8 and, thus, if jurisdiction is proper over the latter Defendants, it should be proper over the former.

The ABV Defendants reply that emails among Scarlett, White, and Niemeyer in late 2015 reflect that Scarlett and White knew nothing about Ahn's financial reporting to WTI until that point and reported their suspicions at that time, and that the bulk of communications with WTI involved

the creation of a new enterprise in which Niemeyer agreed to partner with Scarlett and White. In other words, the ABV Defendants contend that their few contacts with Colorado, particularly with WTI, did not involve activities from which WTI claims it was harmed.

## II.     Statement of Facts

The following are factual allegations made by WTI in its Complaint and offered by the parties for jurisdictional analysis.[1]

1.      WTI is a Colorado general partnership whose partners are all residents of and citizens of Colorado. WTI provides investment funds and business counseling and makes personal connections for other ventures throughout the United States of America.

2.      Steven Signer is currently the managing partner of WTI and Robert Niemeyer ("Niemeyer") is a majority partner.

3.      ABV is a Nevada corporation with its principal place of business located in Carmel, California.

4.      Scarlett is an individual residing in and a citizen of Minnesota.

5.      White is an individual residing in and a citizen of Arizona.

6.      In 2010, at Ahn's request, WTI provided seed funding for CO8, a seller and distributor of wine, in return for equity ownership in CO8 and repayment of its investment with interest.

7.      Between 2010 and 2013, WTI invested $628,500.00 in CO8. ECF No. 7, ¶ 24. CO8 paid $270,300.00 in interest on this amount, but nothing toward the principal. *Id.* ¶ 40.

8.      In late 2014, CO8 and WTI agreed to amend the terms of their 2010 repayment agreement to provide for payment of royalties to WTI on Alias-branded wines sold by CO8 (the "Royalty

---

[1]Unless cited, these facts are undisputed by the moving parties.

Terms"). *Id.* ¶¶ 37-39. WTI was induced to amend the agreement based on withheld sales and revenue information about CO8's other wine brands. *Id.* ¶ 41.

9. Ahn, White, and Scarlett traveled to Colorado in the second half of 2011 to meet with WTI representatives. At that time, Ahn, Scarlett, and White were employees of Cannonball Wine Company, and the purpose of the meeting was to discuss Cannonball's sales team and wine distribution. ECF No. 16-1, ¶ 3; ECF No. 21, ¶ 3.

10. In early 2012, Scarlett and White formed ABV.

11. At or about the same time, Scarlett and White joined with Ahn to create an enterprise between CO8 and ABV pursuant to an Equal Interest Agreement in which each individual would have one-third interest in the enterprise. ECF No. 30-4, ¶¶ 10-11; ECF No. 30-5, ¶¶ 24-26.

12. Ahn, White, and Scarlett traveled to Colorado from January 30 to February 1, 2012 to meet with Signer and Niemeyer to discuss a "new venture." Ahn introduced White and Scarlett to Signer as "individuals responsible for sales at CO8." ECF No. 30-1, ¶ 6. Mr. Signer met with the same individuals on at least one other occasion during that period to discuss WTI's potential investment in the new venture. *Id.* ¶ 7.

13. Thereafter, ABV and CO8 operated as though they were part of one enterprise, with CO8 performing obligations of ABV and paying debts of ABV. ECF No. 30-4, ¶ 15.

14. CO8 transferred trademarks, brands, labels, and equity to ABV for no consideration, spent millions of dollars building and protecting ABV's trademarks, and took out millions of dollars in debt for the mutual, long-term benefit of the CO8/ABV enterprise. *Id.* ¶¶ 11, 13.

15. Ahn, Scarlett, and White made joint decisions regarding the enterprise's structure, management, and ownership. *Id.*

4

16. White acted as CO8's Vice President of Global Sales (ECF No. 30-6, ¶ 1), Scarlett acted as CO8's Vice President of Sales for the Midwest and Western United States (ECF No. 30-8, ¶ 1), and Ahn acted as CEO of CO8 and ABV (ECF No. 30-7, ¶¶ 1, 4).

17. As of November 2016, the documentation supporting the Equal Interest Agreement for the CO8/ABV enterprise was not finalized and, thus, at that time, the documents supporting the entities' corporate structures reflected that Scarlett and White were each 50% owners in ABV and Ahn was the sole shareholder in CO8. ECF No. 30-4, ¶ 14.

18. In or about October 2015, Scarlett and White discovered that Ahn had withheld from them the existence of the WTI Equity Share to WTI and had otherwise provided false financial information about CO8's operations to WTI. ECF No. 7, ¶ 52; ECF No. 16-1, ¶ 6; ECF No. 21, ¶ 5.

19. White and Scarlett next visited Colorado during the period October 5-9, 2015 and stayed at Niemeyer's residence in Boulder. ECF No. 30-2, ¶ 9. The following week, on October 14, 2015, Niemeyer emailed White and Scarlett "four attachments," which appear to be (1) corporate expense projections for ABV, (2) proposed annual salaries of ABV's employees (including $120,000 each for White, Scarlett, and Niemeyer), (3) an organization chart for ABV reflecting White, Scarlett, and Niemeyer as "partners" and officers, and (4) the financial projections for certain wine brands. ECF No. 39-2.

20. White and Scarlett visited Colorado again from November 22 to December 2, 2015 and stayed at Niemeyer's Boulder residence. ECF No. 30-2, ¶ 9. During that period, Niemeyer emailed Scarlett and White a "Priorities List" in which he noted activities necessary to form a company, including licensing, office rental, bank account formation, and financing. ECF No. 39-3. Niemeyer

also listed a "meeting with attorney," including discussion of "fraud/bank loan docs," "Pinot checkbook vs actual receivables," and "phanton [sic] loan to Jai Ahn." *Id.* Finally, Niemeyer noted "WTI Investments" under which he stated, "met with Steve Signer on Nov 20 and Nov 18." *Id.*

21. Also during the November 2015 visit, Niemeyer emailed Scarlett and White again memorializing their "prep for attorney." ECF No. 39-4. Niemeyer listed several topics, including "have a clean break from Greg [Ahn] and have him removed from all business" and "address money that Greg has either taken from Bread and Butter or money paid for bulk wine in that brand." *Id.*

22. Two days after that visit, on December 4, 2015, Niemeyer emailed Scarlett attaching a "checkbook" provided to him by Ahn and asking that Scarlett "spend some time looking to see if the invoices match the checkbook entry data." ECF No. 39-10. Scarlett forwarded Niemeyer's message to White that same day expressing his surprise and concern about apparent inconsistencies between the invoices and the checkbook, and stating, "From what [Niemeyer] explained to me about how the WTI/PN investments transpired and the emails they have, I had no idea the promises Greg gave these guys[ ]." *Id.*

23. On December 7, 2015, Scarlett emailed White and Niemeyer asking, "ABV Wine Company, [White/Scarlett/Niemeyer] - 33.33% each?" ECF No. 39-5. White responded,

> I would say yes. I have mentioned to Robert that we might need to use him for a guarantee. With his Pinot investment and keeping WTI from making a 40% claim on all Co8 wines, we could have the potential to be reduced to 60%. Robert has promised me that WTI will not hold us accountable or go after the equity claim against us for this.

*Id.*

24. White and Scarlett traveled to Colorado for the last time December 15-17, 2015. ECF No. 30-2, ¶ 9.

6

25. In addition to traveling to Colorado in late 2015, White and Scarlett "conferred with representatives of WTI via telephone and email on a near daily basis" regarding their concerns about Ahn's business practices and CO8's reporting of sales information to WTI. ECF 16-1, ¶ 6; ECF No. 21, ¶ 5.

## LEGAL STANDARDS

Here, the motion and briefing are supported by affidavits and materials outside of the pleadings, and the parties have neither requested nor has the Court held a hearing on the motion; accordingly, "the plaintiff need only make a prima facie showing that jurisdiction exists." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *see also Old Republic Ins. Co. v. Continental Motors, Inc.*, 877 F.3d 895, 900 (10th Cir. 2017). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." *OMI Holdings, Inc. v. Royal Ins. Co.*, 149 F.3d 1086, 1091 (10th Cir. 1998); *see also Old Republic Ins. Co.*, 877 F.3d at 900.

> The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party. However, only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true.

*Wenz*, 55 F.3d at 1505 (citations and internal quotation marks omitted). "[T]o defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating that the presence of some other considerations would render jurisdiction unreasonable." *OMI Holdings, Inc.*, 149 F.3d at 1091 (citation and internal quotations omitted).

## ANALYSIS

In addressing a whether a non-resident defendant could be haled into the District of Colorado

7

in a diversity action, the Tenth Circuit recently set forth the proper standards for analysis:

> "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, [571 U.S. 277], 134 S. Ct. 1115, 1121, 188 L.Ed.2d 12 (2014). The law of the forum state and constitutional due process limitations govern personal jurisdiction in federal court. *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000); *see* Fed. R. Civ. P. 4(k)(1)(A). Colorado's long-arm statute, Colo. Rev. Stat. § 13–1–124, extends jurisdiction to the Constitution's full extent. *Benton* [*v. Cameco Corp.*], 375 F.3d [1070,] 1075 [(10th Cir. 2004)]; *Mr. Steak, Inc. v. District Court*, 194 Colo. 519, 574 P.2d 95, 96 (1978) (en banc). The personal jurisdiction analysis here is thus a single due process inquiry. *See Benton*, 375 F.3d at 1075.

*Old Republic Ins. Co.*, 877 F.3d at 903.

When evaluating personal jurisdition under the due process clause, the Tenth Circuit conducts a two-step analysis. At the first step, the court examines "whether the non-resident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'" *TH Agric. & Nutrition, LLC v. Ace European Grp., Ltd.,* 488 F.3d 1282, 1287 (10th Cir. 2007) (citations omitted). If the defendant has sufficient contacts, the court then asks whether "exercise of jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice,'" that is, whether the exercise of jurisdiction is "reasonable" under the circumstances of a given case. *Id.* (citations omitted). "This analysis is fact specific." *ClearOne Commc'ns., Inc. v. Bowers*, 643 F.3d 735, 763 (10th Cir. 2011) (quoting *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1159 (10th Cir. 2010)).

The "minimum contacts" test may be met pursuant to either of two ways – general jurisdiction or specific jurisdiction. First, if a defendant has "continuous and systematic general business contacts" with the forum state, it may be subjected to the general jurisdiction of the forum state's courts. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). Second,

8

even in the absence of "continuous and systematic" contacts, a state's courts may exercise specific jurisdiction over a defendant that "purposefully directed" its activities at the state's residents, if the cause of action arises out of those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985); *see also Benton v. Cameco Corp.*, 375 F.3d 1070, 1076 (10th Cir. 2004) ("A defendant's contacts are sufficient if the defendant purposefully directed its activities at residents of the forum, and the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state.") (internal quotation marks and citation omitted).

In addition to examining the defendant's minimum contacts with Colorado, the Court must analyze whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice" in this case. *ClearOne Commc'ns., Inc.*, 643 F.3d at 764. This inquiry requires a determination of whether personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case. *Id.* In assessing reasonableness, a court considers: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.*

In this case, WTI contends that the Court has personal jurisdiction over not only the ABV Defendants individually, but also the ABV/CO8 enterprise from which their injuries arose.

**I.    Minimum Contacts**

Here, WTI asserts this Court's specific (as opposed to general) personal jurisdiction over Scarlett, White, and ABV.

"Under the specific-jurisdiction requirement, a plaintiff satisfies the minimum-contacts

9

standard by showing that (1) the defendant has purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state, and (2) the litigation results from the alleged injuries that arise out of or relate to those activities." *Bartile Roofs, Inc.*, 618 F.3d at 1160. "Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915 , 919 (2011) (citation and internal quotation marks omitted).

The Supreme Court has articulated the criteria for establishing specific jurisdiction as follows: "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). The "defendant's suit-related conduct must create a substantial connection with the forum state," and "the relationship must arise out of contacts that the defendant *himself* creates with the forum State"... with the "minimum contacts analysis look[ing] to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 284 (citing *Burger King*, 471 U.S. at 475 and *Int'l Shoe Co. v. State of Wa.*, 326 U.S. 310, 319 (1945)). The "plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connections with the forum State" to support the basis for specific jurisdiction. *Id.* at 285 (citing *Burger King*, 471 U.S. at 478).

A.  <u>Did the ABV Defendants Purposefully Direct Activities at Colorado's Residents?</u>

To establish purposeful direction, a plaintiff must demonstrate more than mere foreseeability of causing injury in another state. *Old Republic Ins. Co.*, 877 F.3d at 905 (citing *Burger King*, 471 U.S. at at 474). The plaintiff's demonstration will succeed "where the defendant deliberately has

engaged in significant activities within a State, ... he manifestly has availed himself of the privilege of conducting business there." *Id.*

In cases involving contractual contacts between the defendant and forum state residents, the purposeful direction analysis often looks to "the out-of-state defendant's 'continuing relationships and obligations with citizens of [the forum state].'" *Id.* The Supreme Court "ha[s] upheld the assertion of jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *Id.* (quoting *Walden*, 571 U.S. at 285). "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id.* Instead, courts must evaluate the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* (quoting *Burger King*, 471 U.S. at 479). "An out-of-state defendant's solicitations of or direct communications with forum state residents also provide "some evidence" suggesting purposeful direction." *Id.* (citing *Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005)).

For cases involving torts, the Tenth Circuit has recognized that purposeful direction may be established "when an out-of-state defendant's *intentional* conduct targets and has substantial harmful effects in the forum state." *Id.* at 907. The "harmful effects" test requires a showing of three elements: "(a) an intentional action ... , that was (b) expressly aimed at the forum state ..., with (c) knowledge that the brunt of the injury would be felt in the forum state." *Id.* (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008)).

11

It is unclear from the facts presented whether there were one or two meetings in 2011/2012 among Signer, Niemeyer, Ahn, White, and Scarlett, but construing any factual dispute in the light most favorable to WTI, White and Scarlett attended at least one meeting in Colorado during that time frame to discuss WTI's funding of the CO8/ABV enterprise. ECF No. 30-1, ¶ 6, ECF No. 30-1, ¶ 6. Even taking this allegation as true and assuming WTI's injuries arose (in part) out of the meeting, the Court finds this single meeting, itself, to be insufficient to find that ABV, White, and Scarlett each purposefully directed their activities at Colorado. *See Ruggieri v. General Well Serv., Inc.*, 535 F. Supp. 525, 532 (D. Colo. 1982) ("[e]ven if a defendant enters the forum state to discuss with the defendant some of the details of operating the contract, this contact alone is not sufficient for personal jurisdiction."). There is no indication that the meeting resulted in the establishment of a contract or other relationship between WTI and the ABV Defendants, and no party alleges that there were additional meetings, communications, or other activities by these parties arising from the 2012 meeting. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1078 (10th Cir. 2004) ("Over the course of Cameco's negotiations with Mr. Benton, Cameco established several minor contacts with the state of Colorado. Although none of these contacts individually could support a finding of minimum contacts, we find that in the aggregate, Cameco's 'conduct and connection with the forum State [were] such that he should reasonably anticipate being haled into court there.'").

Moreover, WTI's allegations do not establish that ABV, Scarlett, or White engaged in conduct intended to harm WTI at or arising from the 2012 meeting. The facts presented demonstrate that WTI and Ahn entered into the subject loan agreements in 2010 and 2014 (ECF No. 7, ¶¶ 17, 37-38), and that "Ahn did not inform WTI that he, Scarlett, and White had entered into the Equal Interest Agreement, which excluded the WTI Equity Share" (*id.* ¶ 33). Although WTI alleges that

12

"Ahn disclosed to Scarlett and White the WTI Equity Share *after* they had entered into the Equal Interest Agreement" (*id.* ¶ 32 (emphasis added)), the allegation does not specify when the disclosure was made and the Amended Complaint further alleges that "[i]n or around October 2015, Scarlett and White discovered that Ahn had withheld from them the existence of the WTI Equity Share to WTI" (*id.* ¶ 52). These allegations are insufficient to demonstrate "harmful effects" (for a personal jurisdiction analysis) from Scarlett's and White's participation in the 2012 meeting.

WTI points to subsequent meetings and communications it had with the ABV Defendants in 2015 to demonstrate purposeful direction. However, even if these activities were purposefully directed at Colorado, the Court finds WTI's injuries did not arise out of the activities.

### B. Did WTI's Injuries Arise out of the ABV Defendants' Forum-Related Activities?

The second element a plaintiff must prove to demonstrate specific jurisdiction is that its injuries "ar[o]se out of" [the] defendant's forum-related activities." *Anzures v. Flagship Rest. Grp.*, 819 F.3d 1277, 1280 (10th Cir. 2016) (quoting *Dudnikov*, 514 F.3d at 1071); *see also Bartile Roofs, Inc.*, 618 F.3d at 1160 (a plaintiff must show "the litigation results from the alleged injuries that arise out of or relate to those activities.").

The ABV Defendants successfully rebut WTI's contention that the meetings and communications in late 2015 among Scarlett, White, Niemeyer, and Signer caused or were related to WTI's claims in this case. WTI alleges it was harmed when "Defendants withheld sales and revenue information about CO8's other wine brands from WTI, thereby inducing WTI to amend the Debt Repayment Terms" in 2014. ECF No. 7, ¶ 41. Both Signer and Niemeyer attest generally that "during several of [the 2015] visits, [we] met with Mr. White and Mr. Scarlett to discuss business matters between WTI and CO8/ABV and the financial records and business operations of

13

CO8/ABV." ECF No. 30-1, ¶ 9; ECF No. 30-2, ¶ 9.

However, the facts presented, including those alleged by WTI, demonstrate that until, at the earliest, October 2015, Scarlett and White were unaware of WTI's equity interest and any "misrepresentations" Ahn made to WTI to induce it to invest in the initial seed funding for CO8 in 2010 and enter into the Royalty Terms agreement in 2014. Rather, the evidence here, including email communications among Scarlett, White, and Niemeyer, shows that in late 2015, Scarlett and White reported their suspicions about Ahn "under-reporting sales" to WTI, then proceeded to work with Niemeyer to disengage from Ahn and form a new enterprise. WTI points to no non-conclusory allegations or evidence concerning its late 2015 meetings and communications with Scarlett and White, in which Scarlett and White sought to assist WTI against Ahn, to demonstrate a factual dispute as to whether WTI's harms arose from such activities. *See Wenz*, 55 F.3d at 1505 ("only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true"); *see also Anzures*, 819 F.3d at 1282 (because the defendant's sales ties to Colorado were not the subject matter of the plaintiff's claims, "they ha[d] no place in the jurisdictional calculus"). Accordingly, the Court finds WTI has failed to demonstrate specific jurisdiction over Scarlett, White, and ABV based on the late 2015 activities.

C. <u>Are WTI's Allegations Sufficient to Demonstrate a Single Enterprise over Which the Court has Personal Jurisdiction?</u>

While WTI's allegations and declarations raise no factual disputes as to whether this Court has personal jurisdiction over ABV, Scarlett, and White individually, the allegations and the materials presented demonstrate a factual dispute over whether ABV and CO8 acted as a single enterprise from its inception in 2012 for which Scarlett, White, and Ahn were officers who formed the enterprise under an Equal Interest Agreement at the exclusion of the equity interest WTI had in

14

CO8. *Wenz*, 55 F.3d at 1505 ("all factual disputes must be resolved in the plaintiff's favor"). WTI alleges that Ahn, Scarlett, and White "conspired" under the CO8/ABV enterprise to harm Plaintiff by

> refusing to make payments under the Royalty Terms to Plaintiff, denying WTI's Equity Share in CO8, misappropriating CO8 and ABV funds for other investments and seizing the benefits of those investments for themselves, refusing to honor their agreement to repay the principal amount of Plaintiff's investments in CO8 under the Debt Repayment Terms, refusing to honor their agreement to pay 18% interest on the outstanding principal amount of Plaintiff's investments in CO8 under the Debt Repayment Terms, transferring assets from CO8 to ABV without consideration, selling assets of CO8 and ABV including the sale of the Bread & Butter brand, and seizing the benefits received from sales of assets of CO8 and ABV including the sale of the Bread & Butter brand.

ECF No. 7, ¶ 121. Ahn does not challenge this Court's personal jurisdiction over him; thus, WTI argues that the Court has personal jurisdiction over Ahn's co-conspirators, Scarlett and White.

The Tenth Circuit has recognized that "[t]he existence of a conspiracy and acts of a co-conspirator *within the forum* may, in some cases, subject another co-conspirator to the forum's jurisdiction." *Hart v. Salois*, 605 F. App'x 694, 699 (10th Cir. 2015) (emphasis added) (quoting *Melea, Ltd. v. Jawar SA*, 511 F.3d 1060, 1069 (10th Cir. 2007)). However, "for personal jurisdiction based on a conspiracy theory to exist, the plaintiff must offer more than bare allegations that a conspiracy existed, and must allege facts that would support a prima facie showing of a conspiracy." *Id.* The Tenth Circuit has also "cautioned that 'to hold that one co-conspirator's *presence in the forum* creates jurisdiction over other co-conspirators threatens to confuse the standards applicable to personal jurisdiction and those applicable to liability.'" *Id.* at 700 (emphasis added) (quoting *Melea*, 511 F.3d at 1070). Consequently, "in addition to pleading a prima facie conspiracy, due process requires that a defendant also have minimum contacts with the forum." *Id.* "[A] co-conspirator's *presence within the forum* might reasonably create the 'minimum contacts' with the

15

forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum." *Id.* (emphasis added).

Importantly, in both *Melea* and *Hart*, the Tenth Circuit addressed conspiracy theories supporting personal jurisdiction arguments in which at least one co-conspirator resided or was present in the forum state. *Melea*, 511 F.3d at 1064 (purported co-conspirator of defendant was attorney who resided and conducted business in Colorado from which the litigation arose); *Hart*, 605 F. App'x at 697 (purported co-conspirator of defendant resided in Utah, the forum state). The same is true for the case cited by WTI, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Kozeny*, 19 F. App'x 815 (10th Cir. 2001), in which the plaintiffs alleged a conspiracy among an individual and three entity defendants; the individual owned a $27 million home in Aspen, Colorado, and two entity defendants owned title to or managed the property. *Id.* at 816. A fourth non-resident defendant challenged the court's personal jurisdiction to enter a preliminary injunction against it, but the Tenth Circuit concluded that the "plaintiffs in the present case have shown a 'reasonable probability' that they will prevail on the issue of personal jurisdiction when its action is tried on the merits." *Id.* at 822.

All of these cases stand for the proposition that a conspiracy theory in support of personal jurisdiction is cognizable in the Tenth Circuit so long as one co-conspirator resides or is present in the forum state. *See Hart*, 605 F. App'x at 700 ("[A] co-conspirator's *presence within the forum* might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum.") (emphasis added). It is undisputed in this case that none of the Defendants are residents of or present in Colorado. Accordingly, the Court

16

must conclude that application of the conspiracy theory in this case would be improper to determine personal jurisdiction.[2]

## II. Fair Play and Substantial Justice

Because I conclude that defendants do not have the minimum contacts necessary to support the exercise of specific jurisdiction over them in Colorado, I need not proceed to determine whether the exercise of personal jurisdiction over them would "offend traditional notions of fair play and substantial justice." *Anzures*, 819 F.3d at 1282 (citation omitted).

## III. Transfer of Venue

As the Court has determined it may not exercise personal jurisdiction over the ABV Defendants, the next step is to consider whether to transfer the case prior to dismissal pursuant to 28 U.S.C. § 1631. *Trujillo v. Williams*, 465 F.3d 1210, 1222-23 (10th Cir. 2006); *Arocho v. Nafziger*, 367 F. App'x 942, 951 n.10 (10th Cir. 2010) (dismissal of an action for lack of personal jurisdiction "without an evaluation of whether justice warranted, rather, a transfer under 28 U.S.C. § 1631 would require a remand for consideration of that alternative."). Section 1631 directs that when a court "finds that there is want of jurisdiction, the court shall, if it is in the interest of justice, transfer [the] action" to any other court in which the action could have been brought at the time it was filed or noticed. The Tenth Circuit has interpreted Section 1631 to grant district courts "discretion in making a decision to transfer an action or instead to dismiss the action without prejudice." *Trujillo*, 465 F.3d at 1222–23 (citing *United States v. Botefuhr*, 309 F.3d 1263, 1274 n.8 (10th Cir. 2002)).

---

[2]Even if the Court were able to apply the conspiracy theory, any finding in favor of personal jurisdiction would be limited to activities taken by Scarlett and White after they became aware of WTI's equity interest in the enterprise in late 2015. *See Walker v. Van Laningham*, 148 P.3d 391, 396 (Colo. App. 2006) (a meeting of the minds on the object or course of action is an element necessary to establish a civil conspiracy in Colorado).

17

When deciding whether to transfer or dismiss an action, the Court should consider the following factors: (1) whether "the new action would be time barred"; (2) whether "the claims are likely to have merit"; and (3) whether "the original action was filed in good faith rather than filed after plaintiff either realized or should have realized that the forum in which he or she filed was improper." *Id.* at 1223 n.16 (citations and internal quotations omitted).

Here, the Court finds that, under the circumstances of this case in which the CO8 Defendants have requested transfer to the Northern District of California, the ABV Defendants have joined in the request to transfer in the alternative to dismissal, and WTI strongly opposes such request, the Court in its discretion will deny transfer of the case. While a cursory consideration of the *Trujillo* factors demonstrates transfer may be appropriate, the Court concludes that justice requires WTI be provided the opportunity to decide whether to re-file its complaint against the ABV Defendants in California (or in the states in which these Defendants reside).

## **CONCLUSION**

It is undisputed that the Court has no general personal jurisdiction over the ABV Defendants and WTI has not met its burden of demonstrating this Court's specific personal jurisdiction over the ABV Defendants. Accordingly, Defendants Jonathan White, Matthew Scarlett, and WJSM Enterprises, Inc.'s [d/b/a/Alcohol By Volume ("ABV")] Motion to Dismiss for Lack of Personal Jurisdiction [filed November 19, 2019; ECF No. 16] is **granted**. WTI's claims against White, Scarlett and ABV are dismissed without prejudice pursuant to Fed. R. Civ. P. 12(b)(2).

DATED this 22nd day of March, 2019, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge