IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02269-MEH

WTI PARTNERS,

     Plaintiff,

v.

GREGORY AHN, and
CULT OF 8,

     Defendants.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

     Before the Court is Defendant Gregory Ahn's Motion for Summary Judgment and Defendant Cult of 8's Motion for Partial Summary Judgment (the "Motion"). ECF 85. The Motion is fully briefed, and the Court finds that oral argument is unnecessary in its adjudication of the Motion. Based on the record herein and for the reasons that follow, the Court **grants in part** and **denies in part** the Motion.

## BACKGROUND

     Plaintiff, WTI Partners ("WTI"), initiated this action on August 31, 2018, then filed the operative Amended Complaint (ECF 7) against Defendants Gregory Ahn ("Mr. Ahn") and Cult of 8, Inc. ("CO8"). WTI named three other defendants, Jonathan White ("Mr. White"), Matthew Scarlett ("Mr. Scarlett"), and Alcohol by Volume, Inc., but they were dismissed from the case. ECF 50.

Mr. Ahn is the president of CO8, a company that sells and markets wine. WTI's principal partners, Steven Signer ("Mr. Signer") and Robert Niemeyer ("Mr. Niemeyer"), formed WTI solely to invest in CO8. The Amended Complaint alleges a dispute as to parties' business relationship. First, WTI claims a purported equity interest in CO8 through an oral agreement. Second, WTI alleges the applicability and terms of an agreement between the parties regarding royalty payments in some of CO8's wine brands. Defendants deny WTI ever owned any equity in CO8 and claim that the agreement to pay royalties is binding. In its Amended Complaint, WTI generally alleges claims for breach of contract, breach of fiduciary duty, unjust enrichment, fraud, and civil conspiracy, and it seeks a declaration as to its interests in CO8 and an accounting as to the royalties and proceeds allegedly owed to WTI.

**STATEMENT OF MATERIAL FACTS**

The Court makes the following findings of fact viewed in the light most favorable to Plaintiff WTI, which is the non-moving party in this matter. The Court also does not consider evidence submitted by either party which is not material to the Motion, properly objected to, and/or inadmissible. The following material facts are undisputed unless otherwise cited.

**I.      The parties**

1.      Mr. Ahn is the President and CEO of CO8, a California corporation that he originally founded in or about March 2010.

2.      CO8 produces several brands of wine and operates a number of other wine and food-related businesses in Monterey, California.

3.      In 2009, Mr. Ahn became aware of an opportunity to purchase a quantity of "finished" wine—wine that had already been produced and was ready to bottle, brand and sell—from Foster's Wine Estates (the "Foster's Wine Opportunity").

4.      CO8 was originally formed and created to acquire a large quantity of bulk wine arising from the Foster's Wine Opportunity, to then produce for sale only two brands of wine, "Alias" and "Lamplighter" (the "Alias and Lamplighter Opportunity").

5.      Mr. Ahn presented the Foster's Wine Opportunity to his then-partners at Cannonball Wines, who thought it too risky and declined to invest.

6.      In 2010, Mr. Ahn formed a new entity, CO8, and moved forward, but he still needed money to fund the Foster's Wine Opportunity.

7.      Mr. Ahn did not seek traditional funding sources for CO8.

8.      Mr. Ahn had previously met Messrs. Signer and Niemeyer, the two "Managing Partners" of WTI, and was aware of their interest in investing in a business in the wine industry.

9.      WTI is a Colorado general partnership.

10.     Messrs. Signer and Niemeyer formed WTI as their vehicle to invest in CO8.  Exh. 2 at 10:22–24; Exh. 3 at 18:20–19:8.

11.     WTI's only business was to "invest in a wine operation run by Mr. Ahn."  Exh. 2 at 10:22–24; Exh. 3 at 18:23–19:1.

**II.     WTI and CO8 form a business relationship**

12.     In or about July or August 2010, CO8 sought funding for the Alias and Lamplighter Opportunity from WTI, through its principal partners Mr. Signer and Mr. Niemeyer.  Ahn Decl. at ⁋ 8.

13.     Originally, Mr. Ahn had considered using the name "Wine Liberation Alliance" rather than CO8 to do business.  Exh. 1 at 80:23–81:24.

14.     Sometime in July or August 2010, Mr. Ahn submitted a "proposal" to WTI under the "Wine Liberation Alliance" heading seeking participation from investors and offering "15% equity in

Wine Liberation Alliance for an investment of $400,000.00, or a guaranteed loan of $400,000.00 for 12 months at 15% interest." Exh. 1 at 80:23–81:3; Exh. 11 at CULT0002599.

15.     In or around July or August 2010, CO8 provided WTI with another "proposal" setting forth a "Participation Opportunity for Investors." The document stated that CO8 was "seeking a **$400,000 investment** to be returned at the end of 12 months with **6% interest**. In addition, the investor will receive 15% of net profits from sales of the wine purchase described in this proposal at the end of 2011." Exh. F at CULT0000860 (emphasis in original).

16.     Although the parties reached an agreement, they did not memorialize it in writing.

17.     Generally, the oral agreement involved WTI investing a minimum of $400,000 in CO8, which included funding the initial $150,000 to $200,000 payment to secure the Foster's Wine Opportunity. Exh. 1 at 107:19–109:2; Exh. 2 at 29:15–30:17; Exh. 3 at 16:19–17:2.

18.     On or about September 24, 2010, WTI sent a payment to CO8 in the amount of $95,000.00.

19.     WTI loaned to or invested in CO8 a total of $628,500.00 between September 2010 and April 2013.

20.     In an "Investment Summary" dated September 8, 2010, WTI noted that it was "loaning [CO8], DBA Wine Liberation Alliance, $400,000.00 for the purchase and sale of approximately one million gallons of wine." As part of the transaction, "WTI Partners [was] to receive 15% of the profit from the sale of the wine." Exh. E at R_WTI_004691. Mr. Signer sent this "Investment Summary," after some revisions by Mr. Ahn, to Steven Quoy, a potential investor in WTI. Exh. A at 61:12–62:15.

21.     Mr. Signer believed the "Investment Summary" to be accurate at the time he sent it to Mr. Quoy. Exh. A at 64:2–11.

22.     Once the inventory of wine from the Foster's Wine Opportunity was depleted near the end of 2011, Mr. Ahn and WTI continued their business relationship by selling the Alias and Lamplighter wines using wine from other sources.  Exh. 1 at 125:5–126:4, 127:1–128:10.

23.     On or about May 31, 2011, Mr. Signer sent Mr. Ahn a proposal expressing a "desire to be ongoing partners in" CO8 and requesting "an ownership of 33% after this current round is completed."  Exh. L at R_WTI_004640.

24.     Nowhere in the May 31, 2011 proposal does Mr. Signer state that WTI already had any present ownership interest in CO8.

25.     Mr. Niemeyer thought Mr. Signer's proposal referred to the initial $400,000 investment. Exh. B at 99:5–10.

26.     On or about November 1, 2011, Mr. Ahn sent WTI a document titled, "Cult of 8 Wine Group State of State," which Mr. Signer confirms accurately set forth the WTI "Financing" being "structured" as "a loan to Cult of 8."  The document provides that "[i]n lieu of interest, WTI would be compensated through a 20% share of net profits earned on the above inventory."  Exh. M at CULT0000064.

27.     Mr. Niemeyer did not believe the "Cult of 8 Wine Group State of State" section on "Financing" was accurate when he reviewed it in early November 2011.  Exh. B at 106:4–10.

28.     Nowhere in the November 1, 2011 "Cult of 8 Wine Group State of State" does it recognize that WTI had any stock ownership interest in CO8.

29.     In 2012, CO8 started expanding its portfolio to introduce other wine brands.  Exh. 1 at 145:2–23.

30.     CO8 introduced the Bread & Butter brand in mid-2013.  Exh. 1 at 46:6–8.

31.     Bread & Butter was an enormously successful wine brand; at one point, it was the fastest growing wine brand in the United States.

32.     However, at the time WTI initially provided funds to CO8, and at all times thereafter when WTI provided funding, the only wine brands for which CO8 sought funding for production from WTI were Alias and Lamplighter.  Exh. A at 84:2–18.

33.     WTI never provided funds to CO8 that were specifically earmarked for the Bread & Butter wine brand.

34.     No one at CO8 told Mr. Signer that WTI had invested in or otherwise provided funding for the Bread & Butter brand.  Exh. A at 188:1–4.

35.     Mr. Ahn never told Mr. Signer that WTI owns any part of the Bread & Butter brand.  Exh. A at 195:5–7.

36.     At no time did Mr. Niemeyer communicate to any WTI investor or partner that WTI was a shareholder of CO8.  Exh. B at 91:20–24.

37.     There were no valuations of WTI or the purported patronship interests, no tax returns filed, no minutes taken, no financial statements prepared, and no K-1s issued.  Exh. A at at 10:22–11:2, 11:12–12:2, 16:10–17:24, 19:13–20:4; Exh. B at 24:13–25:1, 26:8–27:12, 27:21–28:25, 29:6–17.

### III.   Royalty Agreement

38.     In or about March 2015, WTI and CO8 orally agreed to convert the outstanding loan obligations of WTI to CO8 into a royalty agreement (the "Royalty Agreement").

39.     The Royalty Agreement was intended to replace the "Debt Repayment Terms" as defined in paragraph 17 of the Complaint.

40.     In an e-mail from Mr. Signer to Mr. Ahn on March 26, 2015, Mr. Signer wrote: "You want to convert our existing loan to AlcByVol [Alcohol by Volume], approximately $410,000.00, to a

royalty arrangement.  That royalty is to be $3.00 per case on sales of Alias and any subsequent label developed to replace the Alias brand.  The royalty is to be paid to WTI quarterly beginning in calendar year 2015.  That is agreeable to WTI."  Exh. I at R_WTI_004484.

41.     Alcohol by Volume is a "dba" of CO8, which is or was owned by Mr. White and Mr. Scarlett.  Ahn Decl. at ⁋ 6.

42.     At various times, Mr. Ahn estimated that the Royalty Agreement would result in royalty payments of $750,000 or $900,000 to WTI over the first three years.

43.     In a June 10, 2015 e-mail to Mr. Signer, Mr. Ahn "estimated" that the royalty payments for the first three years under the Royalty Agreement would be $750,000.

44.     Mr. Signer confirms with respect to the allegation in paragraph 37 of the Complaint, that Mr. Ahn "represented that royalty payments would total $900,000 for the first three years," and it was simply an "estimated" amount and not a guarantee by Mr. Ahn.

45.     Mr. Niemeyer confirms that he did not participate in any discussion with Mr. Ahn concerning the Royalty Agreement, but was told by Mr. Signer that "they were projecting an increase in sales of Alias to be roughly $900,000," and the $900,000 in royalties was the "estimated three years' worth of value of sales" and, therefore, an "approximate payout."

46.     Additionally, in a June 2015 e-mail, Mr. Ahn wrote to Mr. Signer, "Originally, this was structured as a pure equity investment with 50% equity – not a loan."  Exh. J. at CULT0001230.

47.     Mr. Signer disagreed with Mr. Ahn's claim that the "investment" could not be treated both as an equity investment and a loan.  Exh. A at 148:3–149:17

48.     Mr. Signer indicated that, sometime in 2015, he began to have "concerns" about Mr. Ahn's and CO8's conduct.  Exh. B at 206:7–208:10.

49.     Mr. Niemeyer became "curious" and had "concerns' about CO8's and Mr. Ahn's actions. Exh. 3 at 207:16–208:2.

50.     Mr. Niemeyer's "concerns" dealt with "difficulty in reaching [Mr. Ahn]" as opposed to any concern regarding equity ownership.  Exh. 3 at 207:16–208:2.

51.     In February 2016, Mr. Ahn sent a Letter of Intent to WTI, including in it an equity interest for WTI in the Alias and Lamplighter brands.  Exh. 19 at R_WTI_004486.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).  Only admissible evidence may be considered when ruling on a motion for summary judgment.  *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005).

## ANALYSIS

From the outset, the Court notes that neither party addresses the applicable law to this case. WTI is a Colorado general partnership whose partners all domiciled in Colorado. Compl. at ¶ 1. Mr. Ahn is a California citizen, and CO8 is a California corporation. *Id.* at ¶¶ 2–3. In a footnote, Defendants represent they cite to Colorado law "without conceding that Colorado law applies." Mot. at 19, n.7. Where applicable, Defendants provide citations to California law but note that the outcome under either Colorado or California law would be the same. However, Defendants do not explain why California law would necessarily apply. WTI does not address this issue in its Response. The parties have not asked this Court to engage in a choice of law analysis. Because

there is no difference in outcome on any issue based on whether Colorado or California law applies, the Court will not conduct a choice of law inquiry and will rely on Colorado law.

Resolution of certain arguments in the Motion will determine the outcome of others; thus, this Order addresses the claims and arguments in the following sections: (I) whether the Motion goes beyond Phase I of the litigation and is improper; (II) the seventh cause of action for declaratory judgment; (III) the third cause of action for breach of fiduciary duty; (IV) the eighth cause of action for accounting due to fraud; (V) the fourth and fifth causes of action for fraud and fraudulent concealment, respectively; (VI) whether the Royalty Terms replaced the Loan Obligations; (VII) the first cause of action for breach of contract; (VIII) the second cause of action for unjust enrichment; (IX) the sixth cause of action for conspiracy; and (X) the ninth cause of action for constructive trust.

## I.  Phase I Discovery

As a preliminary matter, WTI contends that the Motion is improper for bringing issues beyond the scope of discovery set forth and agreed to in the governing Scheduling Order.  Resp. at 24.  Per the Scheduling Order (ECF 27), the parties propose "that the Court render a determination on the issues of the existence and scope of the Debt Repayment Terms, the WTI Equity Share, and the Royalty Terms, . . . and the status of any payments made pursuant to those terms ["Phase I"]."  ECF 27 at 6–7.  After discovery is completed on Phase I, the Court "will conduct a bench trial and render factual findings and conclusions of law as to the issues in Phase I."  *Id.* at 7.  WTI argues that because Defendants' Motion goes beyond Phase I issues, WTI "has not had the opportunity to conduct meaningful discovery into matters beyond the issues of the existence and scope of the parties' agreement."  Resp. at 25.  As such, WTI urges the Court to deny Defendants' Motion "as to all issues other than the Phase I issues."  *Id.*

Defendants respond that their Motion falls within the Phase I discovery limits.  Reply at 64.  Defendants explain that the focus of the Motion is on WTI's alleged equity interest in CO8 and whether any loan obligations were replaced and superseded.  *Id.*  Accordingly, Defendants contend that each of the arguments in the Motion is properly brought within Phase I.

The Court agrees with Defendants that their Motion falls within the parameters set by the Court for Phase I.  The issues and arguments raised in the Motion squarely concern the matters of Phase I.  For example, the fraud claims directly connect to the Debt Repayment Terms and the Royalty Terms.  *See* Compl. at ¶¶ 102 ("In reliance on the false representations and omissions made by Defendant[] Ahn, . . . Plaintiff agreed to convert the terms of its interest-bearing investment from the Debt Repayment Terms to the Royalty Terms."); 113 ("As a proximate result of the fraudulent concealment of material facts of Defendant[] Ahn, . . . Plaintiff provided investment funds to CO8, converted the terms of its interest-bearing investment from the Debt Repayment Terms to the Royalty Terms, and accepted royalty payments from CO8.").  Therefore, the Court finds that discovery into the scope and status of the Debt Repayment Terms, the Royalty Agreement, and WTI's equity ownership in CO8 necessarily includes discovery relevant to all of WTI's claims.  *See* Fed. R. Civ. P. 56(b) ("[A] party may file a motion for summary judgment at *any* time . . . .") (emphasis added).

In response to the Motion, WTI had options pursuant to Fed. R. Civ. P. 56.  WTI could either respond (which it did), or it could request additional time from the Court to conduct discovery.  "Under Federal Rule of Civil Procedure 56(d), a district court may permit additional time for discovery if a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  *Jenkins-Dyer v. Exxon Mobil Corp.*, 651 F. App'x 810, 814 (10th Cir. 2016) (quoting *Birch ex rel. Birch v. Polaris Indus., Inc.*, 812 F.3d

1238, 1249 (10th Cir. 2015)).  WTI now complains that it "did not conduct discovery" into anything beyond the scope of Phase I.  *See, e.g.*, Resp. at 39.  Yet, WTI did not request additional time under Rule 56(d) or submit an affidavit to the effect that WTI requires additional time. Instead, WTI simply responded to the Motion with a brief and exhibits.  Thus, the Court may consider discovery complete on the issues and continue to adjudicate a motion for summary judgment.  *See Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 832–33 (10th Cir. 1986) ("Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56[] by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate.").

## II.    Seventh Cause of Action:  Declaratory Judgment Against CO8

Although it is the seventh cause of action in WTI's Complaint, the crux of Defendants' Motion concerns WTI's declaratory judgment claim regarding WTI's equity interest in CO8.  In fact, many of Defendants' arguments regarding WTI's other claims hinge on whether the claim for declaratory judgment survives.  Given the importance of the resolution of this claim to the Motion, the Court will address it first.

### A.    Statute of Limitations

WTI seeks a declaratory judgment stating Plaintiff "has a 40% equity ownership interest in CO8 . . . and should have received a *pro rata* distribution of profits."  Compl. at ¶ 127.  CO8 contends that "[e]ven if [WTI] could state a colorable claim to ownership[,] . . . any such claim would be time barred."  Mot. at 20.  CO8 argues that "[b]ecause all of the claims in WTI's Complaint that relate to WTI's alleged ownership interest in CO8 carry with them, at most, a three-year statute of limitations[,] . . . WTI's claim to equity in CO8 must fail as untimely."  *Id.*  WTI

responds that because "the parties were discussing amendments or clarifications to their original investment agreement, . . . WTI was [not] on notice as of the earliest of those discussions that Defendants were breaching or intended to breach the original investment agreement." Resp. at 25–26.

Under Colorado law, courts must look to the underlying "legal theory of recovery from which a limitation period could be applied" for declaratory judgment actions.[1] *Harrison v. Pinnacol Assur.*, 107 P.3d 969, 972 (Colo. App. 2004). WTI's declaratory judgment action is based on the oral agreement the parties allegedly reached. Accordingly, the action sounds in contract, which normally carries a three-year limitations period. Colo. Rev. Stat. §13-80-101(1)(a). Section 13-80-101(1)(a) of the Colorado Revised Statutes is the general statute of limitations for contract actions; however, the statute specifically provides an exception for cases under Section 13-80-103.5, including "[a]ll actions to recover a liquidated debt or an unliquidated, determinable amount of money due to the person bringing the action." If Section 13-80-103.5 governs, a six-year limitations period applies. As stated below, even assuming a three-year statute of limitations, the claims would not be untimely; accordingly, the Court will proceed as if a three-year limitations period applies. WTI filed its complaint on August 31, 2018; thus, the Court would consider anything untimely that occurred prior to August 31, 2015. The time limit on the claim does not begin to run until the party "knew or reasonably ought to have known" that the claim was viable. *Harrison*, 107 P.3d at 972–73.

In this case, if WTI knew or should have known there was a declaratory judgment claim against CO8 regarding its alleged equity interest prior to August 31, 2015, the claim is time-barred.

---

[1] Under California law, the same principle applies. *Snyder v. California Ins. Guarantee Assn.*, 229 Cal. App. 4th 1196, 1208 (2014), *as modified on denial of reh'g* (Oct. 7, 2014).

On or about June 10, 2015, Mr. Ahn told Mr. Signer that "[his] feeling on this is that we can't treat this as a loan and an equity investment at the same time."  Exh. J at CULT0001230.  Defendants contend that this statement should be treated as a rejection "of the exact contention WTI has alleged in this case."  Mot. at 22.  Accordingly, Defendants argue that WTI knew or should have known about the dispute as to equity outside of the limitations period.  *Id.*

Mr. Ahn and WTI engaged in multiple discussions regarding the financial relationship between CO8 and WTI.  It is not clear that any particular moment or conversation during these discussions was meant to be (or should be construed as) a breach or repudiation of the parties' oral agreement.  For instance, there is evidence Mr. Niemeyer became "curious" and had "concerns" about CO8's and Mr. Ahn's actions.  Exh. 3 at 207:16–208:2.  Yet, these "concerns" dealt with "difficulty in reaching [Mr. Ahn]" as opposed to any concern regarding equity ownership.  *Id.* ("I think I had concerns because of the difficulty in reaching [Mr. Ahn] to get answers.").  Another example is in December 2015 when Mr. Ahn represented to WTI that he was "not looking to do anything but realize our intent of getting [everyone] paid."  Exh. 8 at CULT0000187.  As of December 2015, WTI knew Mr. Ahn was working on getting everyone paid; presumably, that included in WTI's mind getting paid on any equity interest.

The earliest time that WTI knew or should have known of a potential breach arises from an email from Mr. Signer to Mr. Ahn in late November 2015.  Exh. 8 at CULT0000188.  Mr. Signer emailed to Mr. Ahn: "Finally[,] we need to resolve our equity ownership.  Your proposal of 10% is not acceptable.  My original notes of our agreement were that we bring the money and you bring the brains and we are 40/60.  It would seem to me that we are 40/60 on everything from that point forward as it was our investors who funded the entire enterprise."  *Id.*  The Court notes that this statement was made in the context of the ongoing discussions between the parties and

14

likely reflects continued negotiations as opposed to knowledge that WTI had a viable claim. To the extent that comment shows WTI knew or should have known about the equity dispute, there is no issue because the knowledge occured in November 2015, within the limitations period. Therefore, the Court is satisfied that no genuine issue of material fact exists demonstrating that the seventh cause of action for declaratory judgment may be time-barred.

  B.  <u>Equity Ownership in CO8</u>

  On the merits of the claim, CO8 argues that "WTI's claims to ownership in CO8 still fail because undisputed facts show that Defendants never granted equity ownership to WTI." Mot. at 23. WTI objects to CO8's characterization of the facts as undisputed and points to various writings as evidence that WTI owned an equity interest in CO8. Resp. at 30–31.

  To be sure, there is significant evidence questioning whether there was ever a formal agreement between the parties as to WTI's alleged equity interest in CO8. Mr. Signer testified that WTI never received any stock of CO8 nor any stock certificate. Exh. A at 19:10–12, 32:7–9. Before WTI gave money to CO8, WTI did not receive documents identifying or confirming WTI as a shareholder of CO8. Exh. A at 35:17–20. WTI never received documentation from CO8 confirming a forty percent equity ownership in CO8, Exh. Aat 32:10–15, 33:8–14; Exh. B 38:15– 19, 40:15–18, never received a K-1 from CO8, Exh. B at 42:24–43:4, nor asked Defendants why a K-1 was never received, Exh. A at 33:15–20. Additionally, Mr. Niemeyer testified that he never saw a financial statement from CO8 classifying WTI as a shareholder. Ex. B at 43:20–23. Mr. Niemeyer stated that he did not recall telling any potential investors in WTI that WTI was (or would be) a forty percent shareholder in CO8. Exh. B at 39:17–23. As part of this case, Mr. Niemeyer also did not produce any documents confirming WTI's forty percent equity interest in CO8. Exh. B at 41:21–42:9.

Moreover, when the topic of equity is raised in communications between the parties, often the topic is placed in the context of equity in the Alias brand as opposed to equity in CO8. For example, in a June 10, 2015 email from Mr. Ahn to Mr. Signer, Mr. Ahn proposed one of two things: (a) "$3.00 royalty per case for 3 years . . . plus 10% equity *in the Alias brand* for WTI" or (b) "35% equity *in the brand* with no royalty, interest, or repayment." Exh. 12 at CULT0001230 (emphasis added). Another example is a December 3, 2015 email from Mr. Ahn to Mr. Signer, in which he wrote: "[B]ut my hope is the same as before: that we can return all investor funds, and eventually *sell Alias* and share the reward for all our hard work." Exh. 8 at CULT0000187.

Despite that evidence, Mr. Signer has testified he expected WTI would receive "[i]nterest on the loan money and equity in the company" for WTI's investment. Exh. 2 at 37:2–23. As of January 2011, Mr. Signer believed that WTI's percentage of equity ownership was forty percent for the $400,000 invested. Exh. 2 at 74:3–24. Mr. Niemeyer testified that Mr. Ahn "needed money, he was having a hard time finding money, and that he wanted to get started as quickly as possible and that he was willing to do a partnership where we had 40 percent, he had 60 percent, and the company had the debt to repay to WTI." Exh. 3 at 37:14–38:1. Mr. Niemeyer's understanding "was that WTI would provide the money to Cult of 8, and in addition to becoming a 40 percent owner of Cult of 8, Cult of 8 would also repay the loan to WTI." *Id.* at 39:24–40:14. WTI understood from Mr. Ahn that WTI's equity interest in CO8 was part of the agreement. *See* Exh. 8 at CULT0000186 ("As for equity, [Mr. Ahn] agree[d] that we had discussed 40/60 based on the funding being equity funding, and not a loan."). WTI also proffers expert testimony to the effect that "it is common for equity owners of private companies to lend money to their companies." Exh. 15 at 4–5.

In fact, there is a January 13, 2011 email from Mr. Ahn to Mr. Niemeyer directly indicating that company ownership would be affected by investments from WTI.  Exh. 17 at CULT0000774.  In that email, Mr. Ahn wrote:

> Per our conversation, here is an updated overview of the deal.  Please take a read through and let me know your thoughts.  I have taken into account that $100,000 has already been invested for 5% of the deal.  This will dilute the company ownership, but the delays in securing the initial funding have put more pressure on cashflow so that our needs have changed.

*Id.*

Moreover, sometime in July or August 2010, Mr. Ahn submitted a "proposal" to WTI under the "Wine Liberation Alliance" heading.  Exh. 1 at 80:23–81:3.  This "proposal" stated that "Wine Liberation Alliance" would offer "15% equity in Wine Liberation Alliance for an investment of $400,000.00, or a guaranteed loan of $400,000.00 for 12 months at 15% interest."  Exh. 11 at CULT0002599.  In or around July or August 2010, CO8 provided WTI with another "proposal" stating that CO8 was "seeking a **$400,000 investment** to be returned at the end of 12 months with **6% interest**.  In addition, the investor will receive 15% of net profits from sales of the wine purchase described in this proposal at the end of 2011."  Exh. F at CULT0000860 (emphasis in original).  Even if neither of these proposals became binding (since they were offered under the "Wine Liberation Alliance" heading), the fact that one proposal from Mr. Ahn included equity and one did not lends credit to the idea that there is a dispute as to WTI's equity ownership in CO8.

Importantly, the standard for deciding a motion for summary judgment is not whether the weight of the evidence supports one view over another; rather, a motion for summary judgment is successful only where there is *no* genuine dispute as to material facts.  The Court finds a genuine dispute exists on whether WTI owns any equity in CO8.  While Defendants have marshalled a strong record calling into question WTI's equity ownership, WTI has provided sufficient evidence

to raise a genuine dispute as to the nature of the oral agreement between the parties. WTI's partners certainly believed they owned CO8 equity, and there is correspondence from Mr. Ahn suggesting that an equity interest was at least part of the conversation. Even if a substantial part of the evidence seems to blur the line between equity in CO8 versus only the Alias wine brand, the muddled nature of exactly what type of equity, if any, WTI owned is precisely why there is a genuine dispute. Finally, given the Court's duty to view the facts in a light most favorable to the non-moving party, there is a genuine dispute that precludes summary judgment.

The Court notes there is evidence, not considered for the purposes of deciding this Motion, which further complicates the issue of whether WTI owned equity in CO8. *See* Exh. 18 at R_WTI_000248 (Mr. White to Mr. Ahn: "In discussing this further with him, he mentioned to me that there is an email from you stating 40% equity in of Cult of 8 for their initial investment back in 2010 along with another 5% for an additional $100k loan in 2011. If this is true, that means that between Dario and WTI you have given 70% of the equity of Alias alone, not to speak about the other brands under Cult of 8."); *id.* (Mr. Scarlett to Mr. Ahn: "Regardless, what makes me pissed off is 10% equity of C8/Alias brand. What?!?! Did you ever think to mention in the past 3.5 years that you'd sold equity to WTI?"). This evidence is hearsay, in that they are statements by non-parties offered to prove the truth of the matter asserted, without any accompanying declaration of how WTI would admit this evidence at trial. Fed. R. Evid. 802; s*ee Brown v. Perez*, 835 F.3d 1223, 1232–33 (10th Cir. 2016) ("Because the agency has not shown that the letter or its contents would be admissible at trial, we may not consider it on summary judgment.").

C.     Fed. R. Civ. P. 56(g) in the Alternative

Alternatively, Defendants request, pursuant to Fed. R. Civ. P. 56(g), that if the Court does not grant the Motion, the Court should "enter an order stating that WTI is not, and has never been,

an owner/equity holder/shareholder of CO, and treating that fact as established in this case." Mot. at 25. Because the Court found a genuine dispute as to WTI's equity ownership in CO8, the Court does not issue an order stating WTI has never been an equity owner of CO8.

### III.    Third Cause of Action:  Breach of Fiduciary Duty Against Ahn

On WTI's third cause of action for breach of fiduciary duty against Mr. Ahn, Mr. Ahn requests summary judgment on the basis that "the only fiduciary duty alleged to be owed by Mr. Ahn arises from WTI's purported shareholder interest in CO8." Mot. at 29–30. WTI concedes that "there can be no breach of fiduciary duty . . . *if* WTI is determined to hold no equity interest" in CO8. Resp. at 37 (emphasis in original). However, WTI argues that because there is a dispute as to the equity ownership, there necessarily must be a genuine dispute as to the fiduciary duty claim. The Court agrees. As all parties acknowledge, the viability of this claim relies on the outcome of the declaratory judgment claim on WTI's alleged equity ownership in CO8. Because the Court finds a genuine dispute exists as to that issue, the Court also finds summary judgment improper with respect to the breach of fiduciary duty claim.

### IV.    Eighth Cause of Action:  Accounting Due to Fraud Against Both Defendants

Defendants request summary judgment on the eighth claim for relief for accounting due to fraud because "[l]ike WTI's claims for fraud, unjust enrichment and civil conspiracy, this cause of action cannot survive because there is no disputed question of fact regarding WTI's alleged ownership of CO8." Mot. at 38. This reasoning does not change in Defendants' reply. *See* Reply at 85. Because the Court has found a genuine dispute of material facts exists as to WTI's equity ownership in CO8, and since WTI offers no other basis for the Court to consider in its Motion, the Court is satisfied that there is a genuine dispute as to the eighth claim for accounting due to fraud.

**V.      Fourth and Fifth Causes of Action:  Fraud and Fraudulent Concealment Against Ahn**

The parties treat WTI's fourth and fifth causes of action for fraud and fraudulent concealment (the "fraud claims"), respectively, the same.  *See* Mot. at 30–35; Resp. at 37–39.  As such, the Court addresses both simultaneously.  Defendants argue that summary judgment is proper on these two claims for three reasons: (a) WTI had no equity ownership, (b) the claims are untimely, and (c) the claims fail on the merits.  The Court addresses these arguments in turn.

A.      Equity Argument

As Defendants argue with other claims, Defendants connect the fraud claims to the declaratory judgment claim, asserting that the fraud claims hinge on the viability of the declaratory judgment action.  Mot. at 30.  Again, the Court finds that the declaratory judgment action survives summary judgment; accordingly, the argument that the fraud claims must be dismissed based on the alleged failure of the declaratory judgment action fails.

B.      Statute of Limitations

Similarly, Defendants' repeated arguments that WTI's claims are untimely fail for many of the same reasons described above.  A three-year statute of limitations applies to claims sounding in fraud.  Colo. Rev. Stat. § 13-80-101(1)(c).[2]  Defendants rely primarily on the fact that Mr. Niemeyer had questions and concerns sometime in 2015 regarding Mr. Ahn's actions which the Court should construe as the beginning of the limitations period.  As described above, Mr. Niemeyer testified that he became concerned that he could not reach Mr. Ahn, not that he had suspicion of fraudulent wrongdoing by Defendants.  Exh. 3 at 207:16–208:2.  There is no clear evidence of WTI or its partners having knowledge (or that they should have knowledge) that a fraud or fraudulent concealment claim arose before August 2015.  If anything, WTI would not

---

[2] California has the same limitations period.  *See* Cal. Civ. Proc. Code § 338(d).

have known about a dispute until February 2016 when Mr. Ahn sent a formal Letter of Intent to WTI.  Exh. 19 at R_WTI_004486.  To the extent the Letter of Intent demonstrated fraudulent action by Mr. Ahn, that is when the limitations period would begin to run; regardless, the claim is timely.

  C. <u>Merits</u>

   1. Phased Discovery

 Before reaching the merits of the fraud and fraudulent concealment causes of action, the Court must address WTI's contention that it would be improper for the Court to do so.  WTI primarily argues that "Defendants cannot use separation of the litigation into phases as both a sword and a shield."  Resp. at 39.  Defendants counter that the Court may consider the Motion's arguments concerning the fraud claims because "WTI's fraud claims are based on its alleged decision to provide investment funds to CO8, convert an alleged interest -bearing investment into the Royalty Agreement and accept royalty payments."  Reply at 66.  As described above in Section I of this Order, the Court finds that Defendants' Motion is properly timed.  Thus, the Court may consider the fraud claims for purposes of summary judgment.

   2. Fraud and Fraudulent Concealment

 Under Colorado law,[3] proving a claim for fraud requires the plaintiff to show  "(1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff."  *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d

---

[3] The same is true under California law.  *Bristol Bay Prods.*, 312 P.3d at 1160 ("[T]he elements of fraud in California and Colorado are identical in all substantive respects.").

1155, 1160 (Colo. 2013).  For the fifth element, a plaintiff must demonstrate "separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages." *Id.*

Similar to the elements for fraud, fraudulent concealment requires a plaintiff to demonstrate "(1) concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages." *Kopeikin v. Merchants Mortg. & Tr. Corp.*, 679 P.2d 599, 601 (Colo. 1984).  Under Colorado law, an "estimate" is treated as "[a] mere expression of an opinion as to the happening of a future event [and] is not actionable." *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 921 (Colo. App. 1991).[4]

Defendants challenge WTI's fraud claims on both the lack of knowledge of the falsity of the representation and on reliance.  Mot. at 32.  Defendants argue WTI could not have relied on any alleged misrepresentation or omission in providing investment funds to CO8, because the alleged misrepresentations and omissions occurred after the investment in CO8.  Mot. at 33–34. In paragraph 97 of the Complaint, WTI lists many of the misrepresentations and/or omissions it alleges occurred.  *See* Compl. at ¶ 97.  Mr. Signer testified that those actions listed under paragraph 97 occurred after WTI had already invested in CO8.  Exh. A at 190:9–25 ("Q. (BY MR. TYRELL) So these things that—occurred as described in paragraph 97, those are things that happened after

---

[4] Under California law, expressions of opinion are treated similarly.  *See Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 308 (2000) ("The law is quite clear that expressions of opinion are not generally treated as representations of fact, and thus are not grounds for a misrepresentation cause of action.").

WTI had already invested in Cult of 8, correct? A. [Mr. Signer] I think that's correct."). Of equal importance is WTI's argument concerning the fraudulent concealment claim that the claim is actionable based on whether Mr. Ahn provided "estimates" of the anticipated royalties that were so far off reality as to constitute misrepresentations. Resp. at 38. Defendants respond that "WTI's alleged inducement to enter into the Royalty Agreement and accept royalty payments is not actionable" because any estimates provided are not guarantees. Mot. at 34–35.

"In a fraud case, . . . the gravamen of the tort is the defendant's conscious knowledge of the falsity of the representation or such recklessness as amounts to a conscious indifference to the truth." *Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo. App. 1989). Mr. Ahn, about a year after entering into the Royalty Agreement, explained why his $750,000 to $900,000 estimate was incorrect:

> The original projections were based on a sales plan that we laid out at the end of 2014, a year when we grew from 20,000 cs to 40,000 cs. The plan was to grow Alias to 80,000 cs this year, doubling sales again from 2014. Unfortunately, we are going to fall short by about half making this year pretty flat.

Exh. 8 at CULT0000186. Hence, Mr. Ahn predicted sales would double again in 2015. Reply at 80. WTI has anticipated that expert testimony will show CO8 "was selling approximately 38,000 cases/year at the time it convinced WTI to convert its debt component to the royalty structure." Resp. at 32 (citing Exh. 15 at 16). Thus, to generate $750,000 in royalties over three years, CO8 "would need to average 83,333 cases/year, or 100,000 cases/year to hit $900,000 in royalties." *Id.* WTI contends there was "no feasible way that Defendants were going to hit these levels" and, thus, asks the Court to find a genuine dispute as to the fraudulent nature of the representations made by Mr. Ahn.

Mr. Ahn also provides some reasons why the sales (and thus the royalties) were not what he expected:

The plan was to grow Alias to 80,000 cs this year, doubling sales again from 2014. Unfortunately, we are going to fall short by about half making this year pretty flat. Part of that was due to losing Costco business last year. We started 2014 off with 3700 cs of Costco business in Q 1, but then nothing the rest of the year. That began a decline in sales throughout the Central division after that. This year we thought that Haggens was going to drive a lot of growth in the West, as they acquired Safeway and Albertsons stores in SoCal, NV, and AZ, as well as additional stores in WA and OR. We invested a lot in that expansion, going from 16 to 180 grocery stores where we were given displays. But then they declared bankruptcy 3 months later, and we've spent the second half of this year fighting to get paid for a lot of that wine. Alias is up in the East and Northwest, but not enough to make up for the shortfall in sales. The brand is still growing, but definitely not at the rate we were pushing for, and the Central region is dragging things down.

Exh. 8 at CULT0000186.

In this case, Mr. Ahn represented to WTI that it would receive roughly $900,000 in royalties over the first three years. Compl. at ¶ 37. As to that representation, Mr. Signer testified that Mr. Ahn did not guarantee royalties of $900,000, and Mr. Signer understood that figure to be an estimate. Exh. A at 131:2–21. Additionally, at issue for the fraudulent concealment claim is the representation made by Mr. Ahn regarding the alleged $1.50 in royalties in perpetuity to WTI. Exh. A at 188:12–189:1. Mr. Signer testified that he did not believe Mr. Ahn was lying when he made the representation that WTI would receive $1.50 in royalties in perpetuity. Exh. A at 188:12– 189:1.

Even when viewed in a light most favorable to the non-movant (WTI), there is no evidence of Mr. Ahn knowingly (or recklessly) providing an estimate of royalties to WTI with fraudulent intent. WTI cites *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) for the proposition that an "enticing" estimate can be actionable as a material misrepresentation. Resp. at 34. The Court finds *In re Apple* distinguishable on two main grounds. First, that case dealt with the capabilities of the product as opposed to expected sales or growth. With the latter category, "[s]tatements regarding expected growth, expected sales, and other predictions related to fiscal

24

success are regularly held to be non-actionable puffery." *Dinnen v. Kneen*, No. 16-CV-00882-PAB-STV, 2017 WL 4163356, at *6 (D. Colo. Sept. 19, 2017) (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). Second, when the statements in question were made, the company made them with reckless disregard for their truth. *In re Apple*, 886 F.2d at 1115. We have no evidence of that here, especially with Mr. Ahn providing the legitimate excuse of a major CO8 customer declaring bankruptcy. Exh. 8 at CULT0000186.

Certainly, the Court does not ignore the expert testimony provided by WTI opining that there was "no feasible way that Defendants were going to" sell enough cases to get close to $750,000 or $900,000 in royalties over three years. Exh. 15 at 16. However, the Court also recognizes the quick math provided by Defendants in the Motion at footnote 11. Mr. Ahn estimated selling 80,000 cases in 2015. At $3.00 per case in royalties, WTI could expect to make $240,000 per year in royalties, or $720,000 over three years. That $720,000 figure is certainly within the ballpark of the provided estimates by Mr. Ahn, The key is that, even if WTI's expert is correct and 80,000 cases sold by CO8 was unfeasible, there is still a general lack of any evidence that Mr. Ahn gave the estimate fraudulently to induce WTI to enter into the Royalty Agreement. "A mere expression of an opinion [or estimate] as to the happening of a future event is not actionable." *Burman*, 821 P.2d at 921. Therefore, the Court finds summary judgment proper with respect to the fourth and fifth causes of action.

## VI. Loan Obligations and the Royalty Agreement

Additionally, CO8 contends there is no genuine dispute of material fact regarding WTI's breach of contract, fraud, and fraudulent concealment claims, because the Royalty Agreement superseded any prior WTI loan obligation. Mot. at 26. WTI argues there is a genuine dispute as to whether the Royalty Agreement was void as procured by fraud. Resp. at 31.

As noted above, the Court finds that WTI cannot prove fraud as a matter of law.  WTI offers no other basis for challenging the replacement of the Loan Obligations with the Royalty Agreement other than fraud.  Therefore, there is no material factual issue disputing the adoption of the Royalty Agreement by both parties.  However, WTI does argue that "if the [R]oyalty [A]greement is deemed valid, there is further factual dispute over the length of time that royalties would be paid."  Resp. at 34.  The Court agrees.

When the parties reached their agreement, Mr. Niemeyer testified that he believed any prior loan agreement was replaced with the Royalty Agreement under which WTI would receive $3.00 per case of wine for three years and then $1.50 in perpetuity thereafter.  Exh. B at 152:8–154:15. In an October 9, 2015 email from Mr. Ahn to Mr. White and Mr. Scarlett (former business partners), Mr. Ahn had a slightly different take on the terms of the agreement.  He wrote:

> In total, WTI raised $628,500 over time and in pieces with the last injection of $20,000 being April 2013.  As of April 2015, $518,023 has been distributed back to WTI.  There was no interest rate or written agreements between Cult of 8 and WTI.  This obviously caused some confusion as to what was a loan and what was equity . . . . What we agreed to at the beginning of the year was to convert to a royalty structure and eliminate the debt off our books.  So what we pay is $3.00 royalty per case for 3 years (estimated $750,000), plus 10% equity in the Alias brand for WTI.  The length of time may be renegotiated as we are not on track to hit our projected sales targets this year, thus the royalty is much lower than estimated when we made the agreement.

Exh. 18 at R_WTI_000249.  That October 9, 2015 statement also differs from Mr. Ahn's June 10, 2015 email to Mr. Signer, in which "the idea was to pay $3 per case for 3 years, then adjust that royalty down to $1.50 in perpatuity [sic]."  Exh. 12 at CULT0001230.

There are a disputes as to the exact terms of the Royalty Agreement, including the length of time by which royalties would be paid and the question of what equity, if any, was involved. The Court is not prepared to, as Defendants request, "enter an order stating that CO8 owes WTI nothing on the WTI Loan Obligations . . . because the Royalty Agreement superseded and replaced

26

any remaining obligation to repay principal and interest." Mot. at 25. However, pursuant to Fed. R. Civ. P. 56(g), the Court finds that the parties entered into a Royalty Agreement. Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."). The exact terms of the Royalty Agreement, along with the implications of the Royalty Agreement, will be left to resolve at trial.

## VII.   First Cause of Action:  Breach of Contract Against CO8

Notably, "Defendants concede that WTI's claim for breach of the alleged Royalty Agreement is timely pursuant to the applicable three-year statute of limitations only. CO8 seeks judgment in its favor with respect to the WTI Loan Obligations; WTI's claim that CO8 breached its contract by failing to pay royalties to WTI under the Royalty Agreement is not at issue" in the Motion. Mot. at 27, n.12.

### A.   Statute of Limitations

The parties disagree as to the applicable statute of limitations for the breach of contract claim. CO8 argues that WTI's breach of contract claims concerning the Loan Obligations are time-barred because a three-year limitations period applies pursuant to Colo. Rev. Stat. § 13-80-101(1)(a). Mot. at 28–29. WTI argues the claims are subject to a six-year statute of limitations pursuant to Colo. Rev. Stat. § 13-80-103.5 and, thus, are not time-barred. Resp. at 35.

"In the absence of a clear expression of legislative intent to the contrary, a statute of limitations specifically addressing a particular class of cases will control over a more general or catch-all statute of limitations." *Mortg. Inv. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176, 1185 (Colo. 2003). As mentioned above when discussing the limitations period for the declaratory judgment claim, Section 13-80-101(1)(a) of the Colorado Revised Statutes is the general statute of

limitations for contract actions, but an exception exists under Section 13-80-103.5 for cases including "[a]ll actions to recover a liquidated debt or an unliquidated, determinable amount of money due to the person bringing the action."  According to WTI, the breach of contract claim on the Loan Obligations to CO8 is for the invested amount plus eighteen percent interest.  Resp. at 35.  That amount is an unliquidated but determinable amount of money due to WTI; accordingly, the amount of debt is easily calculable, so the six-year statute of limitations should apply.  *Torres-Vallejo v. Creativexteriors, Inc.*, 220 F. Supp. 3d 1074, 1086 (D. Colo. 2016) (applying the six-year limitations period where plaintiff was entitled to "an hourly wage and are therefore claims that are 'easily calculable.'").  Moreover, Section 13-80-103.5 should apply since it specifically addresses debt issues as opposed to the more general class of contract issues.  Because the six-year limitations period applies, even if Defendants are correct that the clock began to run in 2015, the breach of contract claim is not barred by the statute of limitations.[5]

>   B.   Merits

As to the merits of WTI's breach of contract claim, WTI asserts CO8 failed to repay invested sums with eighteen percent interest, and in the event the Royalty Agreement is deemed binding, failed to pay royalties as agreed.  Resp. at 35.  The Court has found that the parties entered into the Royalty Agreement, although the Court cannot determine the exact terms of the Royalty Agreement, because they are in dispute.  Defendants concede that the breach of the Royalty Agreement is not subject to the Motion, so the Court is left with addressing only the repayment of invested sum.  Although there is a valid Royalty Agreement, the Court cannot grant summary judgment on the breach of contract claim without knowing the exact terms of the Royalty

---

[5] Although California has a two-year statute of limitations for oral contracts, the debt statute of limitations (four years) would apply in this instance.  Cal. Civ. Proc. Code §§ 337, 339.

Agreement.  Put differently, the Court cannot summarily find there is no repayment necessary to WTI based on its investment, because the exact terms of the Royalty Agreement are disputed. Therefore, the Court rejects summary judgment as to the first cause of action for breach of contract.

## VIII.   Second Cause of Action:  Unjust Enrichment Against Both Defendants

On the second cause of action for unjust enrichment, Defendants request summary judgment because the claim is based on WTI's equity interest in CO8 and because the claim is untimely.  Regarding Defendants' argument on WTI's equity interest, the Court denies summary judgment as to the unjust enrichment claim, because the Court finds there is a genuine dispute as to material fact regarding WTI's ownership in CO8.  Therefore, the Court will only address Defendants' timeliness argument.  Claims for unjust enrichment are subject to a three-year statute of limitations in Colorado.  Colo. Rev. Stat. § 13-80-101(1)(a); *see Sterenbuch v. Goss*, 266 P.3d 428, 437 (Colo. App. 2011).  Because the Court has found the declaratory judgment claim regarding equity is timely, the unjust enrichment claim also is timely.

## IX.    Sixth Cause of Action:  Civil Conspiracy Against Ahn

WTI has stipulated in its Response that it will dismiss the sixth cause of action for civil conspiracy.  Resp. at 35, n.5 ("WTI will stipulate to dismissal of its claim for Civil Conspiracy (Sixth Cause of Action) . . . . [because] the claim is no longer relevant to this action.").  Based on the stipulation, the Court will grant summary judgment on this claim.

## X.    Ninth Cause of Action:  Constructive Trust Against Both Defendants

Defendants ask for summary judgment on the ninth cause of action for constructive trust because "[a] constructive trust is a remedy, not a standalone cause of action."  WTI claims that "constructive trust is regularly pled as a claim in Colorado state and federal courts, and that it is

permitted to seek imposition of a constructive trust regardless of whether it exists as a separate claim or as a remedy." Resp. at 40.

Defendants are correct that "constructive trusts are remedial nature and are inappropriately pled as a separate cause of action." *Bryant v. Community Choice Credit Union*, 160 P.3d 266, 276 (Colo. App. 2007). Indeed, a constructive trust "is not a substantive cause of action that Colorado recognizes" and is instead "a remedy when other violations of substantive law have been proven."[6] *McNees v. Ocwen Loan Servicing, LLC*, No. 16-CV-01055-WJM-KLM, 2019 WL 1762947, at *8 (D. Colo. April 22, 2019). Therefore, as a separately pleaded cause of action, the Court finds, as a matter of law, summary judgment is appropriate on the WTI's ninth cause of action; however, the Court recognizes that WTI also included constructive trust under its "Prayer for Relief" section of the Complaint. The Court's judgment does not remove the inclusion of constructive trust since it is a remedy that may be included in a prayer for relief. *See id.* at *6 (The court *sua sponte* added "constructive trust" to the prayer for relief section when it was not originally there, but rather "constructive trust" was pled as a separate cause of action.).

## CONCLUSION

Accordingly, Defendants' Motion [filed February 12, 2020; ECF 85] is **granted in part** and **denied in part**. The Motion is denied as to the first cause of action for Breach of Contract, the second cause of action for Unjust Enrichment, the third cause of action for Breach of Fiduciary Duty, the seventh cause of action for Declaratory Judgment, and the eighth cause of action for Accounting. As to the fourth cause of action for fraud, the fifth cause of action for Fraudulent

---

[6] Under California law, a constructive trust is considered an "equitable *remedy*." *Haskel Engineering & Supply Co. v. Hartford Acc. & Indem. Co.*, 78 Cal. App. 3d 371, 375 (Cal. App. 1978) (emphasis added).

Concealment, the sixth cause of action for Civil Conspiracy, and the ninth cause of action for Constructive Trust, the Motion is granted, and those claims are dismissed with prejudice.

Entered and dated this 16th day of June, 2020, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge